UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA C.,<br><br>                              Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Acting Commissioner<br>of Social Security,[1]<br><br>                              Defendant. | Case No.:  19-cv-00636-JM-JLB<br><br>**REPORT AND<br>RECOMMENDATION**<br><br><br>**[ECF Nos. 10; 12]** |

This matter is before the Court on cross-motions for summary judgment.  (ECF Nos. 10; 12.)  Plaintiff Patricia C. moves under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying her application for Supplemental Security Income ("SSI").

This Report and Recommendation is submitted to United States District Judge Jeffrey Miller pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c) of the United States District Court for the Southern District of California.  After a careful review of the moving and opposing papers, the administrative record, and the applicable law, the Court

---

[1]     Andrew Saul is hereby substituted as the defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

**RECOMMENDS** that the District Court **GRANT** Plaintiff's Motion for Summary Judgment, **DENY** the Commissioner's Cross-Motion for Summary Judgment, and that judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   PROCEDURAL BACKGROUND

On June 14, 2017, Plaintiff filed an application for SSI, alleging disability commencing January 5, 2017.  (Administrative Record ("AR") 188.)  After her application was denied initially and upon reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ") on January 25, 2018.  (AR 100.)  On October 1, 2018, Plaintiff, her attorney, and vocational expert Connie Guillory ("the VE") appeared before ALJ Howard K. Treblin ("the ALJ") at an administrative hearing.  (AR 35.)  In a decision dated November 8, 2018, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act.  (AR 23.)  The ALJ's decision became the final decision of the Commissioner on January 28, 2019, when the Appeals Council denied Plaintiff's request for review.  (AR 5.)  This timely civil action followed.  (ECF No. 1.)

## II.   SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  *See* 20 C.F.R. § 416.920.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 30, 2017,[2] the application date. (AR 17.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; degenerative disc disease of the cervical ///

---

[2]   The hearing decision states that Plaintiff applied for SSI on May 30, 2017, but the date on the application that alleges a disability beginning on January 5, 2017, is actually June 14, 2017.  (AR 188.)  There is no application in the record with a date of May 30, 2017.

spine, status post cervical spine surgery in February 2018 with overall improvement of symptoms; and moderate degenerative disease of the bilateral shoulders.  (*Id.*)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments, including Listings 1.02 and 1.04.  (AR 19.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC"):

> to lift or carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours out of an 8-hour workday; stand or walk for 6 hours out of an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; avoid concentered exposure to extreme cold or heat, vibrations, unprotected heights[,] or dangerous or moving machinery.

(AR 20.)

At Step Four, the ALJ compared the RFC assessed to the demands of Plaintiff's past relevant work as a hand packer.  (AR 23.)  The ALJ accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be able to perform her past relevant work as a hand packer, both as actually done and as generally done in the national economy.  (*Id.*)

Based on his determination that Plaintiff could return to her past relevant work, the ALJ concluded that Plaintiff was not disabled under the Social Security Act.  (*Id.*)

### III.   STANDARD OF REVIEW

The Social Security Act allows for unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. § 405(g).  The scope of judicial review, however, is limited.  The Commissioner's final decision should not be disturbed unless: (1) the ALJ's findings are based on legal error; or (2) the ALJ's determinations are not supported by substantial evidence in the record as a whole.  *See Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000).  Substantial evidence is "more than a mere scintilla, but may be less than a preponderance."  *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001).  Substantial evidence is "relevant evidence that, considering the entire ///

3

record, a reasonable person might accept as adequate to support a conclusion." *Id.*; *accord Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003).

In making this determination, the Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. *See Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Where the evidence can reasonably be construed to support more than one rational interpretation, the Court must uphold the ALJ's decision. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. *See Lewis*, 236 F.3d at 509.

## IV.   PLAINTIFF'S CLAIMS OF ERROR

Plaintiff raises the following claims of error:

1.     The ALJ erred by failing to find Plaintiff's post-traumatic stress disorder, major depressive disorder, and anxiety as severe impairments at Step Two. (ECF No. 10 at 16–19.)

2.     The ALJ erred by failing to find that Plaintiff meets or equals Listing 1.04(A) for spinal disorders. (*Id.* at 19–22.)

3.     The ALJ's RFC assessment is not supported by substantial evidence because it does not account for Plaintiff's mental health limitations. (*Id.* at 23–24.)

4.     The ALJ's finding that Plaintiff can frequently reach, handle, and finger with her upper extremities and perform light work is not supported by substantial evidence. (*Id.* at 24–27.)

## V.   DISCUSSION

### A.   Claims 1 and 3

#### 1.   Claim 1—The ALJ's Step Two Determination

As stated, the ALJ determined Plaintiff to have severe impairments of degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and moderate degenerative disease of the bilateral shoulders. (AR 17.) The ALJ found that

Plaintiff's medically determinable mental impairments of depressive disorder NOS and anxiety disorder NOS, considered singly and in combination, did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities, and therefore were nonsevere.  (AR 18.)  Plaintiff argues that the ALJ erred in finding her anxiety, depression, and PTSD were nonsevere impairments.

       a.  <u>Legal Standard</u>

Step Two of the Commissioner's sequential evaluation process requires the ALJ to determine the medical severity of the claimant's medically determinable impairments. 20 C.F.R. § 416.920(a)(4)(ii).  Under the Commissioner's regulations, an impairment is not severe "if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 416.922(a).  Social Security Ruling ("SSR") 85-28 has clarified that this means "an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities."  SSR 85-28, 1985 WL 56856 (Jan. 1, 1985); *see also Webb v. Barnhart*, 433 F.3d 683, 686–87 (9th Cir. 2005) (stating that an impairment or combination of impairments may be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." (quoting *Smolen v Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996))).  Step Two, then, is "a *de minimis* screening device [used] to dispose of groundless claims," *Smolen*, 80 F.3d at 1290, and an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is "clearly established by medical evidence," SSR 85-28, 1985 WL 56856.  On review, a court must determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that the claimant did not have a medically severe impairment or combination of impairments.  *See Webb*, 433 F.3d at 687.

In evaluating the severity of mental impairments specifically, an ALJ is required to follow a "special technique."  20 C.F.R. § 416.920a(a).  Once an ALJ determines that the claimant has a medically determinable mental impairment, he must rate the degree of functional limitation resulting from the impairment in four broad functional areas:

understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  20 C.F.R. § 416.920a(b), (c).  In rating the degree of limitation, the ALJ uses a five-point scale: none, mild, moderate, marked, and extreme.  20 C.F.R. § 416.920a(c)(4).  If the ALJ rates the degrees of the claimant's limitations as "none" or "mild," the impairment is generally considered not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.  20 C.F.R. § 416.920a(d)(1).

> b.   Summary of Dr. Walker's and Dr. Smith's Treatment Notes

Plaintiff first presented to Dr. Walker, her psychologist, on November 1, 2017, with "anxious mood and affect," and detailed a history of decades-long alcohol abuse and periods of crystal meth use, with the most recent use in about 2015.  (AR 1004–05.) Plaintiff reported a history of self-harm as a teenager and two suicide attempts, the first around 2010 and the second around 2016.  (AR 1004.)  Plaintiff further "reported increased depression" due to her "back pain."  (*Id.*)  Dr. Walker's mental status exam ("MSE") of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; memory "other" ("able to recall events, difficulty with specific dates about events"); and age appropriate motor, judgment, and insight.  (AR 1007.)  Dr. Walker diagnosed Plaintiff with unspecified anxiety disorder, unspecified depressive disorder, severe alcohol use disorder in sustained remission, and moderate stimulant use in sustained remission.  (*Id.*)  In her mental health severity analysis, Dr.

///
///
///
///
///
///
///
///

Walker assessed Plaintiff at mild risk,[3] with moderate clinical complexity,[4] moderate life circumstances,[5] and high benefit of integrated care.  (AR 1008–09.)

Plaintiff first presented to Dr. Smith, her psychiatrist, on November 10, 2017, for an initial psychiatric evaluation.  (AR 998.)  Plaintiff reported "depressive symptoms including anhedonia, low mood, poor concentration, and low appetite, as well as low energy and motivation."  (*Id.*)  Plaintiff further reported "anxiety in public situations and avoidance of crowds" and "a clear history of physical abuse."  (*Id.*)  Dr. Smith found that she "endorse[d] 8 of 9 criteria" for Borderline Personality Disorder, but he "hesitate[d] to diagnose a personality disorder on the basis of one interaction."  (*Id.*)  Dr. Smith further found Plaintiff's "depressive symptoms consistent with MDD as well as anxiety symptoms and history of trauma consistent with PTSD."  (*Id.*)  Dr. Smith prescribed 5 mg of Lexapro daily for two weeks and then 10 mg daily.  (AR 999.)  Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; linear thought

_____

[3]    Family Health Centers of San Diego has three levels for rating a patient's risk for "suicidal/violent, high risk behavior, catastrophic illness/loss, criminogenic behavior, impulsivity, insight, ego discordance." (AR 1008.)  "Mild risk" indicates "passive ideation or fantasy-no danger to self/danger to others; good impulse control; minimal criminal background; good insight; and ego dystonic (refers to thoughts, impulses, and behaviors that are viewed as unacceptable, distressing, or inconsistent with one's self-concept)." (*Id.*)

[4]    Family Health Centers of San Diego has three levels for rating a patient's "clinical complexity," defined as "serious [and] persistent mental illness versus situational/reactive, recovery status, functional [and] cognitive impairment, treatment resistance, medication complexity, frequent hospitalization, co-occurring medical and alcohol or drug disorder." (AR 1008.)  "Moderate clinical complexity" indicates "schizophrenia, major mood or anxiety disorder—stable on medications, baseline function, sustained recovery; prior history of effective treatment, uncomplicated management; minimal cognitive impairment; no recent hospitalizations; [alcohol or drug disorder] misuse." (*Id.*)

[5]    Family Health Centers of San Diego has three levels for rating a patient's "life circumstances," defined as "biopsychosocial assessment, availability of resources, environmental stressors, family/social/faith-based support, resilience."  (AR 1008.)  "Moderate life circumstances," indicates "intermittent emotional distress as a manifestation of a mental illness which is worsened by life stressors; limited resources [and] support; strained resilience." (*Id.*)

process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; euthymic mood/affect; and no delusions or suicidal ideation. (*Id.*) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 1000–01.)

Plaintiff presented to Dr. Smith on December 6, 2017, and reported that she felt "about the same," but noted "some slight improvement." (AR 995.) Plaintiff further noted that "she [wasn't] crying as much" and was "more motivated to do things than she was before." (*Id.*) Dr. Smith continued Plaintiff's Lexapro prescription at 10 mg daily. (*Id.*) Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; linear thought process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; improving mood/affect; and no delusions or suicidal ideation. (AR 996.) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 996–97.)

Plaintiff presented to Dr. Smith on January 2, 2018, and reported that "[s]ince her last visit she got engaged to be married" and was "excited and hopeful for the future." (AR 992.) Plaintiff further reported that "in general, her mood [was] good, she [was] able to enjoy things, and her anxiety [was] minimal." (*Id.*) Dr. Smith found Plaintiff to be "doing well, with nearly full remission of depressive symptoms" and "improved" anxiety. (*Id.*) Dr. Smith continued Plaintiff's Lexapro prescription at 10 mg daily. (*Id.*) Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; linear thought process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; euthymic mood/affect; and no delusions or suicidal ideation. (AR 993.) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 994.)

///

///

Plaintiff presented to Dr. Walker on January 9, 2018, with "mildly anxious mood and affect." (AR 1099.) Plaintiff "noted some reduction in depression [symptoms]" and "reduced frequency of crying spells." (*Id.*) Dr. Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; anxious mood; normal memory; and age appropriate motor, judgment, and insight. (AR 1098.) Dr. Walker assessed mild risk, moderate clinical complexity, moderate life circumstances, and high benefit of integrated care. (AR 1099–100.)

Plaintiff presented to Dr. Walker on January 31, 2018, with "anxious/depressed mood affect." (AR 1096.) Plaintiff reported "increased depression [symptoms] over the last week, reporting that she stayed in bed for 4 days straight, isolated from other[s], and expressed irritability toward her spouse when he interacted with her." (*Id.*) However, Dr. Walker also noted that although Plaintiff "reported difficulty [with] motivation to get out of bed," she was "able to behaviorally activate[] on Monday to work." (*Id.*) Dr. Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; poor recent memory; age appropriate motor; and good judgment and insight. (AR 1095.) Dr. Walker assessed mild risk, moderate clinical complexity, severe[6] life circumstances, and high benefit of integrated care. (AR 1095–96.)

Plaintiff presented to Dr. Smith on February 1, 2018, and reported that she was "worried about her upcoming neck surgery" but was "doing well," and her "anxiety and depression ha[d] slowly improved." (AR 1092.) Dr. Smith noted that Plaintiff was "doing relatively well, still with some depressive and anxious symptoms," so he increased her Lexapro prescription to 15 mg daily. (*Id.*) Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; linear thought process; normal

---

[6]     "Severe life circumstances" indicates "persistent emotional distress a manifestation of chronic mental illness; relies on behavioral health system for resources; limited resilience." (AR 1097.)

thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; euthymic mood/affect; and no delusions or suicidal ideation. (AR 1093.) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 1094.)

Plaintiff presented to Dr. Smith on March 1, 2018, and reported "more tearfulness and anxiety" since her last visit, having had neck surgery three weeks ago. (AR 1089.) Dr. Smith noted that Plaintiff was "feeling more depressed and anxious compared to her last visit" and "for several months she had been slowly improving, noting reductions in depressive and anxiety symptoms." (*Id.*) Dr. Smith further noted that "her worsening over the past several weeks has been in the context of increased pain, increased (prescribed) opioids, limited mobility, and psychosocial stressors." (*Id.*) Dr. Smith increased Plaintiff's Lexapro prescription to 20 mg daily, noting that he would "give some more time for these issues to resolve/improve before assuming the Lexapro has failed." (*Id.*) Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; linear thought process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; dysphoric mood/affect; and no delusions or suicidal ideation. (AR 1090.) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 1091.)

Plaintiff presented to Dr. Walker on March 6, 2018, with "anxious/depressed mood and affect." (AR 1087.) Plaintiff reported "increased depression [symptoms] after her surgery last month . . . and continued anxiety about leaving the home, being out in world." (*Id.*) However, Plaintiff reported that she "did behaviorally activate to go to WalMart," and "she is most often able to behaviorally activate to leave her home for the tasks she has to do, but tends to avoid leaving for activities she may enjoy." (*Id.*) Dr. Walker's MSE of Plaintiff found loud speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; normal memory; slowed motor; age appropriate ///

judgment; and good insight.  (AR 1086.)  Dr. Walker noted suicidal ideation[7] and fleeting thoughts.  (*Id.*)  Dr. Walker assessed mild risk, moderate clinical complexity, moderate life circumstances, and high benefit of integrated care.  (AR 1087–88.)

Plaintiff presented to Dr. Smith on March 21, 2018, and reported that she felt "much better" since her last visit.  (AR 1083.)  Plaintiff reported that her mood was "brighter," and she had "more energy" and "less hopelessness."  (*Id.*)  Dr. Smith found that Plaintiff had "significantly improved since last [her] visit," and her "post-surgical pain, increased opioid doses, and increased stress . . . likely exacerbated her underlying depression and anxiety" at her previous visit.  (*Id.*)  Dr. Smith noted that the increased Lexapro dose "may have been helpful," and continued her Lexapro prescription at 20 mg daily.  (*Id.*)  Dr. Smith's MSE of Plaintiff found cooperative behavior; articulate language; linear thought process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; euthymic mood/affect; and no delusions or suicidal ideation.  (AR 1083–84.)  Dr. Smith found moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care.  (AR 1085.)

Plaintiff presented to Dr. Walker on April 6, 2018, with "anxious/depressed mood with intermittent[] tearful affect."  (AR 1129.)  Plaintiff "reported an increase in intrusive memories from her past, most notably trauma memories from childhood related to her parents" and "sadness, crying spells, fatigue, chronic pain, worry, fear, avoidance, isolation, feeling bad about herself, difficulty focusing, [and] disturbances in sleep."  (*Id.*) Dr. Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; normal memory; and age appropriate motor, judgment, and insight.  (AR 1128.)  Dr. Walker assessed moderate

---

[7]     Specifically, Dr. Walker noted that Plaintiff "reported fleeting passive [suicidal ideation] when feeling overwhelmed" and that she "[d]enied plan, intent, means."  (AR 1086.)  Throughout the Dr. Walker's treatment notes, when Plaintiff reported suicidal ideations, they were consistently described as passive and/or fleeting, and Plaintiff consistently denied plan, intent, and means.  (AR 1079, 1103, 1108, 1116, 1125.)

clinical complexity, severe life circumstances, and high benefit of integrated care.  (AR 1129–30.)

Plaintiff presented to Dr. Walker on May 11, 2018, with "anxious/depressed mood and affect." (AR 1126.)  Plaintiff reported that her "anx[iety] [symptoms] [were] a 10 out of 10" with "fear, excessive worry, racing thoughts, desire to flee, difficulty in crowds, [and] fear of judgment." (*Id.*)  Plaintiff further reported that her "depression [symptoms] [were] a 10 out of 10" with "sadness, low motivation, anhedonia, passive [suicidal ideation], feeling bad about self, changes in sleep and appetite, isolation, shame, [and] guilt." (*Id.*)  Plaintiff discussed her "current stressors," which included "short-term memory loss, chronic pain, financial and disability application process, [and] worries about her sons." (*Id.*)  Dr. Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; normal memory; and age appropriate motor, judgment, and insight. (AR 1125.) Dr. Walker noted suicidal ideation and fleeting thoughts. (*Id.*)  Dr. Walker assessed mild risk, moderate clinical complexity, severe life circumstances, and high benefit of integrated care.  (AR 1126–27.)

Plaintiff presented to Dr. Smith on May 16, 2018, and reported that she was "dealing with 'ups and downs' related to family stressors," but was "trying to remain optimistic." (AR 1120.)  Plaintiff further reported "no significant depressive symptoms" and "somewhat elevated" anxiety, but it was "generally better than several months ago." (*Id.*) Dr. Smith found that Plaintiff was "continuing to do well," her "anxiety had generally improved over the past several months," and she was "making gains both in therapy as well as in her day-to-day life." (*Id.*)  Dr. Smith again stated that Plaintiff's "[g]ains have been slow and steady," and continued her Lexapro prescription at 20 mg daily. (*Id.*)  Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; articulate language; circumstantial thought process; normal thought content; appropriate associations, judgment/insight, span/concentration; and recent/remote memory; euthymic mood/affect; and no delusions or suicidal ideation.  (AR 1121.)  Dr. Smith assessed

moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 1122.)

Plaintiff presented to Dr. Walker on June 5, 2018, with "anxious/depressed mood and anxious, restless affect, and racing thoughts." (AR 1117.) Plaintiff reported "sadness, crying spells, feeling bad for herself, rumination, difficulty with ADLs, changes in sleep and appetite, passive [suicidal ideation], periods of hopelessness and helplessness, [and] anhedonia." (*Id.*) Plaintiff "noted [a] significant increase in anxiety" since the date for the administrative hearing was scheduled and "daily pain as she copes with several chronic health conditions (neck, hip, back, etc.)." (*Id.*) Plaintiff also reported recent self-harm with a "dull knife along her forearms and legs" which, by Dr. Walker's observation, did not yield cuts or scabs and "looked more like she had scratched her skin, but did not break the skin." (AR 1116.) Dr. Walker's MSE of Plaintiff found loud speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; poor recent and remote memory; restless and fidgety motor; and good judgment and insight. (AR 1115–16.) Dr. Walker further found self-injurious behavior, passive suicidal ideation, and fleeting thoughts. (AR 1116.) Dr. Walker assessed mild risk, moderate clinical complexity, severe life circumstances, and high benefit of integrated care. (AR 1118–19.)

Plaintiff last presented to Dr. Smith on June 19, 2018, and reported "ups and downs," stating that she had "enjoy[ed] her 18-year-old daughter's graduation last month" but "also had sad days, spending 1–2 days in her home." (AR 1112.) Dr. Smith found Plaintiff "stable, at baseline, continuing to deal with some fluctuations related to stress and her medical issues, and with anxiety related to PTSD." (*Id.*) Dr. Smith continued Plaintiff's Lexapro prescription at 20 mg daily and planned for her to return in 2–3 months. (*Id.*) Dr. Smith's MSE of Plaintiff found cooperative behavior; speech within normal limits; linear thought process; normal thought content; appropriate associations, judgment/insight, attention span/concentration, and recent/remote memory; euthymic mood; and no suicidal ideation. (AR 1113.) Dr. Smith assessed moderate clinical complexity, moderate life circumstances, and medium benefit of integrated care. (AR 1114.)

1      Plaintiff presented to Dr. Walker on June 20, 2018, with "pleasant mood/affect,

2  noting improved mood over the last [two] days, increased energy, not over-sleeping,

3  increased motivation (behaviorally activating, accomplishing tasks and to-do list),

4  increased sense of hope, exercising, and reduction in intensity and frequency of

5  flashbacks." (AR 1109.) Plaintiff also reported a "continued desire to isolate as a form of

6  avoidance" and "urges to use meth or alcohol but . . . did not act on [the] urges." (*Id.*) Dr.

7  Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative

8  behavior; appropriate affect; pleasant mood; poor recent and remote memory; hyperactive

9  motor; and age appropriate judgment and insight. (AR 1107–08.) Dr. Walker further found

10  passive suicidal ideation and fleeting thoughts. (AR 1108.) Dr. Walker assessed mild risk,

11  moderate clinical complexity, moderate life circumstances, and high benefit of integrated

12  care. (AR 1109–10.)

13      Plaintiff presented to Dr. Walker on June 27, 2018, with "anxious mood/affect,"

14  reporting that she felt "overwhelmed with medical referrals/doctor's app[ointments] to

15  address several chronic pain conditions in her back, neck, shoulders, and hip." (AR 1104.)

16  Plaintiff reported "continued [symptoms] of anxiety and depression, but denied recent

17  flashbacks or intrusive memories." (*Id.*) Plaintiff also "noted increased energy and

18  motivation" and was "accomplishing her daily tasks which in turn [was] improving self-

19  esteem." (*Id.*) Dr. Walker's MSE of Plaintiff found speech normal; coherent thought

20  process; cooperative behavior; appropriate affect; anxious mood; poor recent and remote

21  memory; and age appropriate motor, judgment, and insight. (AR 1102–03.) Dr. Walker

22  further found passive suicidal ideation and fleeting thoughts. (AR 1103.) Dr. Walker

23  assessed mild risk, moderate clinical complexity, moderate life circumstances, and high

24  benefit of integrated care. (AR 1105.)

25      Plaintiff last presented to Dr. Walker on July 11, 2018, with "anxious/depressed

26  mood" and was "fidgety during [the] session." (AR 1080.) Plaintiff noted a "significant

27  increase[] in fear, worry, somatic [symptoms], avoidance, efforts to suppress [domestic

28  violence] intrusive memories with her ex . . . changes in sleep and appetite, feeling bad

about herself, difficulty focusing, difficulty with ADLs, etc." after her ex-boyfriend had contacted her on social media. (*Id.*) Plaintiff reported "continued chronic pain." (*Id.*) Dr. Walker's MSE of Plaintiff found normal speech; coherent thought process; cooperative behavior; appropriate affect; depressed and anxious mood; normal memory; and age appropriate motor, judgment, and insight. (AR 1078–79.) Dr. Walker further found passive suicidal ideation and fleeting thoughts. (AR 1079.) Dr. Walker assessed mild risk, moderate clinical complexity, moderate life circumstances, and high benefit of integrated care. (AR 1080–81.)

        c.    <u>The ALJ's Step Two Determination</u>

At Step Two, the ALJ determined that Plaintiff's medically determinable impairments of depression and anxiety were nonsevere. (AR 18.) In making this finding, the ALJ reasoned:

> The claimant has been treated at Family Health Center and La Maestra Community Health Center for depression and anxiety since November 2017. She has been treated with psychotropic medications and individual therapy. She has reported no side effects. Mental state examinations have been mostly unremarkable. On January 2, 2018, she reported that she had a "good" mood, was able to enjoy things, had minimal anxiety, and was "excited and hopeful for the future" as she was "thrilled" about having been engaged to be married. At that time, her depressive symptoms were noted to be "nearly full remission." In March 2018, she reported a "brighter" mood, more energy, less hopelessness after spending a "very enjoyable" weekend wither her husband and children. In June 2018, she reported improved mood, with increased energy, increased motivation, increased sense of hope, with stable mood and improved anxiety. Progress notes from La Maestra Community Health Center in 2018 show that she had been oriented in all spheres with appropriate mood and affect.
>
> The claimant's medically determinable mental impairments of depressive disorder NOS and anxiety disorder NOS, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

(*Id.* (citations omitted).)

///

The ALJ then proceeded to rate the degree of functional limitation resulting from plaintiff's mental impairments in each of the four broad functional areas as "mild." (AR 18–19.)   In the first functional area of understanding, remembering, and applying information, the ALJ cited to Plaintiff's September 14, 2017 Function Report, noting that Plaintiff "stated she has an 'impossible time following any type of instructions, written or spoken'" but was "able to manage her finances without problem." (AR 18.)  The ALJ further reasoned that Plaintiff's MSEs "have been unremarkable," her pain management specialist (Dr. Steiner) "consistently indicated that her cognitive functioning has been intact," and her neurologist found "recent and remote memory" intact in August 2018.  (AR 18–19.)

In the second functional area of interacting with others, the ALJ cited to Plaintiff's Function Report, noting that Plaintiff "stated that she is a 'complete recluse' and 'cannot function in any social setting' as she gets anxious and panics when around others," yet "is able to go out on her own and does not need someone to accompany her." (AR 19.)

In the third functional area of concentrating, persisting, or maintaining pace, the ALJ cited to Plaintiff's Functional Report, noting that Plaintiff "stated that she is unable to 'stay focus[ed] for more than 2 minutes," but her MSEs "have been unremarkable" and Dr. Steiner "consistently indicated that her cognitive functioning has been intact." (*Id.*)

In the fourth functional area of adapting or managing oneself, the ALJ cited to Plaintiff's Function Report, noting that Plaintiff "is independent in her activities of daily living including sweeping and washing dishes, making her bed, shopping, [and] watering her plants" and "takes care of her boyfriend by cooking and cleaning up." (*Id.*)  The ALJ further noted that Plaintiff stated that "[s]he has no problems with personal care." (*Id.*)

The ALJ concluded, finding that because Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas, they are nonsevere." (*Id.*)

///

///

1      d.    Discussion

2          As stated, Plaintiff argues that the ALJ erred by finding her medically determinable

3   mental impairments[8] as nonsevere.  (ECF No. 10 at 16.)  In sum, Plaintiff argues that the

4   ALJ's severity determination is not supported by substantial evidence because the ALJ

5   mischaracterized her mental health records and did not present the "whole picture," citing

6   only to "isolated instances of improvement."  (*Id.* at 17–18; ECF No. 14-1 at 3–6.)  Plaintiff

7   contends that the ALJ's failure to find her mental impairments to be severe was an error

8   that was harmful to Plaintiff because "it is likely" Plaintiff met or equaled Listings 12.04,

9   12.06, and 12.15, and it infected the RFC, which does not contain any mental health

10  limitations.  (ECF Nos. 10 at 18; 14-1 at 6–7.)

11         In opposition, the Commissioner argues first that "any perceived error by not finding

12  a severe mental impairment [at Step Two] was harmless," because the ALJ found Plaintiff

13  suffered severe medically determinable impairments, and therefore proceeded to

14  subsequent evaluation steps.  (ECF No. 12-1 at 11.)  The Commissioner argues that,

15

16

17

_____

18  [8]        Specifically, Plaintiff argues that the ALJ erred in finding her anxiety, depression,

19  and PTSD as nonsevere.  (ECF Nos. 10 at 16; 14-1 at 2.)  However, the ALJ did not find
    Plaintiff's PTSD as a medically determinable mental impairment or even address Plaintiff's

20  PTSD in the hearing decision.  (*See* AR 18 ("The claimant's medically determinable

21  impairments of depressive disorder NOS and anxiety disorder NOS . . . .").)  Neither party
    addresses this fact.  As stated, at Step Two, an ALJ must determine whether the claimant

22  has a medically determinable impairment that is "severe" or a combination of impairments

23  that is "severe."  20 C.F.R. § 416.920(c).  Medically determinable impairments are those
    that "result from anatomical, physiological, or psychological abnormalities that can be

24  shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R.

25  § 416.921.  Plaintiff here argues that the ALJ erred in finding her PTSD as nonsevere, but
    she does not challenge the ALJ's determination that her PTSD was not a medically

26  determinable impairment.  The Court will not manufacture arguments for Plaintiff.  *See*

27  *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).  Accordingly,
    the Court limits is analysis to whether the ALJ erred in finding Plaintiff's medically

28  determinable mental impairments of anxiety and depression, but not PTSD, as nonsevere.

nevertheless, the ALJ's determination that Plaintiff's medically determinable mental impairments were nonsevere is supported by substantial evidence. (*See id.* at 11–13.)

The Court agrees with Plaintiff's assertion that the ALJ's summary of the medical evidence pertaining to her mental impairments is not a complete summary, as it does not set forth all of statements she made to Dr. Walker and Dr. Smith concerning her anxiety and depression symptoms. As highlighted by Plaintiff, the hearing decision cites only to select treatment notes from Dr. Walker and Dr. Smith and focuses on treatment notes reporting improvements in Plaintiff's anxiety and depression symptoms. Nevertheless, the Court does not find, as Plaintiff urges, that the ALJ engaged in a selective reading of the record that resulted in a severity determination that was not supported by substantial evidence.

First, the ALJ's summary of Dr. Smith's and Dr. Walker's treatment notes is incomplete, but the ALJ was not required to discuss all the medical evidence presented to him. *See Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984). Moreover, the evidence upon which the ALJ relied—Plaintiff's statements of improvement in January, March, and June 2018—indicated sustained improvement overall of Plaintiff's depression and anxiety. Even though Plaintiff continued to experience ups and downs in her mental health during this time, Dr. Walker's and Dr. Smith's treatment notes demonstrate that Plaintiff's mental health slowly and steadily improved during the nine months they treated her.

After her first appointments with Dr. Walker and Dr. Smith in November 2018, Plaintiff reported "some slight improvement" and increased motivation in December 2017. (AR 995.) As noted by the ALJ, by January 2018 Plaintiff reported good mood, minimal anxiety, and "nearly full remission of depressive symptoms" to Dr. Smith and "some reduction in depression" and "reduced frequency of crying spells" to Dr. Walker. (AR 992, 1099.) On January 31, 2018, Plaintiff reported "increased depression" symptoms to Dr. Walker and stated that she "stayed in bed for 4 days straight," as Plaintiff points out in reply. (AR 1096; ECF No. 14-1 at 6.) However, the next day, Plaintiff reported to Dr.

Smith that she was "doing well" and that her "anxiety and depression had slowly improved." (AR 1092.)

In early March 2018, Plaintiff reported "more tearfulness and anxiety" and "increased depression [symptoms]" after undergoing neck surgery. (AR 1087, 1089.) Dr. Smith specifically noted that Plaintiff's "worsening over the past several weeks ha[d] been in the context of increased pain, increased (prescribed) opioids, limited mobility, and psychosocial stressors" from her neck surgery. (AR 1089.) Later in the month, Plaintiff reported that she "felt much better" since her last appointment with Dr. Smith, and Dr. Smith opined that "post-surgical pain, increased opioid doses[,] and increased stresses . . . likely exacerbated her underlying depression and anxiety at her previous visit." (AR 1083.) As noted by the ALJ, by March 21, 2018, Plaintiff reported that her mood was "brighter," and she had "more energy" and "less hopelessness." (*Id.*)

In April 2018, Plaintiff continued to report symptoms from anxiety and depression to Dr. Walker, and on May 11, 2018, Plaintiff reported that her anxiety and depression were both a "10 out of 10." (AR 1126, 1128.) However, just five days later, on May 16, 2018, Plaintiff reported "no significant depressive symptoms" and that her anxiety was "somewhat elevated" but "generally better than several months ago." (AR 1120.) Dr. Smith found that Plaintiff's "anxiety had generally improved over the past several months," and that her gains were "slow and steady." (*Id.*)

In June 2018, Plaintiff reported a "significant increase in anxiety" to Dr. Walker since the date for her administrative hearing was scheduled (AR 1116), but Dr. Smith found that she was "stable, at baseline, continuing to deal with some fluctuations related to stress . . . ." (AR 1112.) As noted by the ALJ, on June 20, 2018, Plaintiff reported an "improved mood over the last 2 days, increased energy, not over-sleeping, increased motivation (behaviorally activating, accomplishing tasks and to-do list), increased sense of hope, exercising, and reduction in intensity and frequency of flashbacks." (AR 1109.) Plaintiff continued to report anxiety and depression symptoms on June 27, 2018, but also "noted increased energy and motivation." (AR 1104.)

1    When assessing Plaintiff's treatment history as whole, one could rationally find
2    overall improvement in Plaintiff's anxiety and depression symptoms.  Although the ALJ's
3    summary of Dr. Walker's and Dr. Smith's treatment notes did not account for both the ups
4    and downs in Plaintiff's mental health progression, the ALJ's summary of the evidence
5    was fair, and the Court may not substitute its judgment for that of the ALJ's.  *See Molina*
6    *v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to
7    more than one rational interpretation, we must uphold the ALJ's findings if they are
8    supported by inferences reasonably drawn from the record." (citing *Tommasetti v. Astrue*,
9    533 F.3d 1035, 1038 (9th Cir. 2008))).

10   Further, in assessing the severity of Plaintiff's anxiety and depression, the ALJ
11   considered all the MSEs completed by Dr. Walker and Dr. Smith, finding them "mostly
12   unremarkable."  (AR 18.)   Plaintiff takes issue with the ALJ's characterization of her
13   MSEs, arguing that Dr. Walker noted that Plaintiff was experiencing suicidal ideation in
14   addition to a depressed an anxious mood.  (ECF No. 10 at 17.)  Plaintiff also points to
15   instances where Dr. Walker found "poor recent and remote memory, racing thoughts, and
16   restless motor activity."  (*Id.*)  A review of the record shows that Dr. Walker consistently
17   found that Plaintiff's mood was anxious and/or depressed (AR 1007, 1079, 1086, 1095,
18   1098, 1103, 1115, 1125, 1128), at times also taking note of poor recent memory and/or
19   poor remote memory (AR 1095, 1103, 1116) and suicidal ideation (AR 1079, 1086, 1095,
20   1098, 1103, 1108, 1116, 1125).  However, as noted above, Dr. Walker always qualified
21   Plaintiff's suicidal ideation as "passive" or "fleeting, passive," even when Plaintiff reported
22   "self-harm with a dull knife."[9]  (AR 1116.)  Additionally, Dr. Walker's MSEs found

23

24

_____

25   [9]    Plaintiff argues that the ALJ ignored treatment notes that indicated "she had engaged
26   in self-mutilation by cutting her arms."  (ECF No. 10 at 17.)  However, as stated, Dr.
27   Walker's treatment notes indicated that when she examined Plaintiff's arms, they "did not
     have cuts, scabs, or need medical attention," and "it looked more like she had scratched
28   her skin, but did not break the skin."  (AR 1116.)  Thus, the ALJ's failure to specifically

abnormalities in plaintiff's memory on only a few occasions, and Dr. Smith's MSEs always found Plaintiff's recent/remote memory as "appropriate."   As the above summary of Plaintiff's treatment records details, the majority of her MSEs *were* unremarkable.  (*See supra* pp. 6–15.) Although the ALJ did not address the few instances where Plaintiff's MSEs indicated abnormalities in memory or comment on Plaintiff's passive suicidal ideation, the Court cannot find that the ALJ mischaracterized Plaintiff's MSEs, for the record supports a conclusion that they were "mostly unremarkable."

Finally, as provided above, the hearing decision reflects that the ALJ followed the "special technique" used to determine whether a claimant has a severe mental impairment, and he rated the degree of functional limitation resulting from Plaintiff's mental impairments as "mild" in each of the four broad functional areas.  (*Supra* pp. 15–16.) Under the regulations, a finding of mild limitation in each of the four broad functional areas supports a conclusion that Plaintiffs impairments are nonsevere.   20 C.F.R. § 416.920a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities").

In her motion, Plaintiff does not specifically challenge the ALJ's findings of a mild limitation in each of the four broad functional areas or the ALJ's reasoning in support of his findings.  It is only in her reply that Plaintiff seems to challenge the ALJ's reasoning with respect to the first and fourth broad functional areas, arguing first that the ALJ cited to findings by Dr. Steiner and Dr. Chapman, but "Dr. Steiner was [her] *pain management specialist*," and "Dr. Chapman was [her] neurologist, who also did not treat [her] mental impairments, but rather her Chronic Pain Syndrome."  (ECF No. 14-1 at 5.)  The Court construes this argument to be that the findings of Dr. Steiner and Dr. Chapman were not

---

include this incident in the hearing decision does not render his summary a mischaracterization of Plaintiff's mental health records.

probative of Plaintiff's limitations in the first functional area (understanding, remembering, or applying information).   Plaintiff further argues that the ALJ mischaracterized her testimony with respect to her activities of daily living when assessing the fourth functional area (adapting or managing oneself) because he omitted "qualifiers she used to describe her activities, such as only cleaning 'a little,' cooking 'simple' meals and not every day, that even simple things can take her 'all day,' and that her boyfriend must encourage her to do these things."  (*Id.*)

The Court agrees with Plaintiff that the ALJ's statement that "Dr. Steiner has consistency indicated that [Plaintiff's] cognitive functioning has been intact" (AR 19) lends little to the conclusion that Plaintiff has a mild limitation in understanding, remembering, and applying information.[10]  However, Dr. Chapman's finding that Plaintiff's "[r]ecent and remote memory [were] intact" in August 2018 *is* probative of Plaintiff's ability to remember.  Further, the ALJ did not cite only to Dr. Steiner and Dr. Chapman's treatment notes as support for finding a mild limitation in the first functional area; he also cited to Plaintiff's Functional Report and her MSEs.  Additionally, although the ALJ omitted some qualifiers from Plaintiff's statements in her Functional Report, the Court does not find that the ALJ's omission of these qualifiers substantially changed the meaning of Plaintiff's statements.  The Court finds that the ALJ's findings with respect to all four broad functional areas were based on a rational interpretation of the evidence.

For the foregoing reasons, the Court does not find that the ALJ erred in finding that Plaintiff's medically determinable mental impairments of anxiety and depression were nonsevere and that substantial evidence supported his determination.

///

---

[10]   The Court notes that although Plaintiff contends that the ALJ could not fairly rely on statements from Dr. Steiner concerning Plaintiff's mental health limitations because Dr. Steiner did not treat her anxiety and depression, Plaintiff nevertheless also argues that the ALJ should have considered Dr. Steiner's "depression screenings," which "indicated moderately severe depression."  (*See* ECF Nos. 10 at 18; 14-1 at 5.)

1

2.      Claim 3—The ALJ's Mental RFC Determination

2

Plaintiff next argues that the ALJ erred by not including any mental health

3

limitations in her RFC.  (ECF No. 10 at 23–24.)  Plaintiff contends that had the ALJ found

4

her mental limitations severe, he would have assessed "a more restrictive RFC."  (ECF No.

5

14-1 at 7.)   As best the Court can glean from the Commissioner's opposition, the

6

Commissioner argues that the ALJ did not err in his RFC assessment because Plaintiff's

7

depression and anxiety "had only mild limitations on her functioning."  (ECF No. 12-1 at

8

19.)

9

a.      Legal Standard

10

"RFC is an assessment of an individual's ability to do sustained work-related

11

physical and mental activities in a work setting on a regular and continuing basis."  SSR

12

96-8P, 1996 WL 374184, at *1 (July 2, 1996).  "RFC is what an individual can still do

13

despite his or her limitations."  *Id.*  In determining a claimant's RFC, the ALJ must consider

14

"all of the relevant medical and other evidence."  20 C.F.R. § 416.945(a)(3).  If a claimant

15

has more than one impairment, the ALJ must consider the limiting effects of all

16

impairments, including "medically determinable impairments that are not 'severe.'"  20

17

C.F.R. § 416.945(a)(2); *accord Buck*, 869 F.3d at 1048–49 (quoting 1996 WL 374184, at

18

*5).   "The RFC therefore should be exactly the same regardless of whether certain

19

impairments are considered 'severe' or not."  *Buck*, 869 F.3d at 1049 (emphasis omitted).

20

Thus, a claimant generally cannot be prejudiced by the ALJ's failure to consider a

21

particular impairment as severe at Step Two, as long as the ALJ finds that the claimant has

22

at least one severe impairment, and still addresses the nonsevere impairment when

23

considering the claimant's RFC.  *See id.*

24

b.      Discussion

25

As an initial matter, Plaintiff seems to misunderstand Step Two's purpose as a

26

"threshold determination meant to screen out weak claims."  *Buck*, 869 F.3d at 1048.  Step

27

Two "is not meant to identify the impairments that should be taken into account when

28

determining the RFC."  *Id.* at 1048–49.  As stated, in assessing the RFC, the ALJ must

consider limitations and restrictions imposed by all an individual's impairments, *including* nonsevere impairments.  20 C.F.R. § 416.945(a)(2).  Thus, it does not follow that the RFC would have been "more restrictive" had the ALJ found Plaintiff's mental impairments severe, as Plaintiff contends.  The RFC should have been "exactly the same."  *See Buck*, 869 F.3d at 1049.  Neither is the ALJ's nonseverity finding at Step Two determinative of whether a medically determinable impairment translates into limitations of the claimant's residual function, as the Commissioner seems to argue.

An ALJ must consider even mild mental limitations in his or her RFC analysis.  *See Hutton v. Astrue*, 491 F. App'x 850 (9th Cir. 2012).  In *Hutton*, the ALJ determined at Step Two that the plaintiff's PTSD caused mild limitations in concentration, persistence or pace, but was nonsevere.  *Id.* at 850.  The ALJ, however, explicitly excluded consideration of the plaintiff's PTSD in making his RFC determination because he found that the claimant lacked credibility.  In holding that the ALJ had erred, the Ninth Circuit reasoned that, "while the ALJ was free to reject [the plaintiff's] testimony as not credible, there was no reason for the ALJ to disregard his own finding that [the plaintiff's] nonsevere PTSD caused some 'mild' limitations in the areas of concentration, persistence, or pace."  *Id.* at 851.  Numerous courts in the Ninth Circuit have followed the reasoning of *Hutton* and found reversible error where the ALJ failed to at least consider mild mental limitations when assessing the claimant's RFC.  *See, e.g.*, *Aida v. Saul*, No.: 3:19-cv-00476-AJB-RNB, 2020 WL 434319, at *4–5 (S.D. Cal. Jan. 28, 2020), *adopted by* 2020 WL 1905356 (S.D. Cal. Apr. 17, 2020); *Soloman v. Comm'r Soc. Sec.*, 376 F. Supp. 3d 1012 (D. Ariz. 2019); *Uranna G. V. Saul*, No.: 3:18-cv-02117-RNB, 2019 WL 5342537, at *3–4 (S.D. Cal. Oct. 21, 2019); *Carlson v. Berryhill*, No. 18-cv-03107-LB, 2019 WL 1116241, at *17–18 (N.D. Cal. Mar. 10, 2019); *Barrera v. Berryhill*, No. CV 17-07096-JEM, 2018 WL 4216693, at *4–5 (C.D. Cal. Sept. 5, 2018); *Gates v. Berryhill*, No. ED CV 16–00049 AFM, 2017 WL 2174401, at *2 (C.D. Cal. May 16, 2017); *Smith v. Colvin*, No. 14-cv-05082-HSG, 2015 WL 9023486, at *8–9 (N.D. Cal. Dec. 16, 2015); *Kramer v. Astrue*, No. CV 12–5297–MLG, 2013 WL 256790, at *2–3 (C.D. Cal. Jan. 22, 2013).

1
2
3
4
5
6
7

Following *Hutton*, the Court here finds that the ALJ erred because the hearing decision does not reflect any reasoned consideration in the RFC analysis of the mild mental limitations the ALJ found Plaintiff to have at Step Two.  As stated above, the ALJ found mild mental limitations stemming from Plaintiff's depression and anxiety in all four of the broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (AR 18–19.)  After making this finding, the ALJ specifically acknowledged that:

8
9
10
11
12
13
14
15

> [t]he limitations identified in the "paragraph B" criteria <u>are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process</u>.  The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process <u>requires a more detailed assessment by itemizing the various functions</u> contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p).  Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

16
17
18
19
20
21
22
23

(AR 19 (emphasis added).)  Despite this acknowledgement and despite his recognition that the mental RFC assessment "requires a more detailed assessment" than that made at Step Two, the ALJ's discussion of Plaintiff's RFC contains no analysis of Plaintiff's mild mental limitations.[11]  Instead, the ALJ stated simply that "[t]he analysis of the claimant's nonsevere impairments, supra, is incorporated by reference herein."  (AR 20.)  By incorporating the *same* Step Two severity assessment into the RFC assessment, the ALJ inarguably did not make "a more detailed assessment."  Further, the ALJ's "boilerplate assertion . . . that his RFC assessment 'reflects the degree of limitation the undersigned has

24

25
26
27
28

[11]   An argument could be made that the ALJ assessed Plaintiff's mental RFC at Step Two when he followed the special technique and addressed the paragraph B criteria.  However, the hearing decision does not make clear that this is what the ALJ intended, and in any event, the ALJ's analysis of the paragraph B criteria does not shed sufficient light on why the mild mental limitations found by the ALJ were not included in the RFC.

found in the "paragraph B" mental function analysis' was not sufficient."  *See Uranna G.*, 2019 WL 5342537, at *4.  The ALJ does not articulate why, after finding that Plaintiff had mild mental limitations in each of the four broad categories, he did not include any restrictions related to those limitations in the RFC.  The Court will not infer in a vacuum that the ALJ considered Plaintiff's mild mental limitations but then validly concluded that they did not cause any significant limitation necessitating inclusion in the RFC.  *See Gates v. Berryhill*, No. ED CV 16–00049 AFM, 2017 WL 2174401, at *3 (C.D. Cal. May 16, 2017) (rejecting the Commissioner's argument that one can "infer" that the ALJ considered plaintiff's mild mental limitations as inconsistent with *Hutton*).

Thus, the ALJ erred in his mental RFC determination by not considering, or making clear that he considered, Plaintiff's mild mental limitations.  Moreover, the Court is unable to find that the error was "inconsequential to the ultimate nondisability determination" and therefore harmless.  *Molina*, 674 F.3d at 1115.  The Court cannot determine what the result would have been if the ALJ had considered plaintiff's mild mental limitations when assessing her RFC.  At the administrative hearing, the ALJ presented two hypotheticals to the VE, neither of which contained functional limitations relating to all of the mild limitations found by the ALJ (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself).[12]  (*See* AR 55–57.)

**B.    Claim 2—The ALJ's Listing Determination**

Plaintiff next argues that the ALJ erred at Step Three by failing to find that she met or equaled Listing 1.04(A) for Spinal Disorders.  (ECF No. 10 at 19–22.)

///

///

---

[12]    The ALJ's first hypothetical to the VE did not contain any mental health limitations. (AR 56.)   The ALJ's second hypothetical to the VE contained a limitation only in understanding, remembering, and carrying out simple tasks.  (AR 57.)

**1.    Legal Standard**

    a.    Listings Determinations

In 20 C.F.R. Part 404, Subpart P, Appendix 1, the Commissioner has set forth certain impairments that are presumed to be of sufficient severity to prevent the performance of work.  20 C.F.R. § 416.925(a).  At Step Three of the Commissioner's sequential evaluation process, the ALJ must determine whether a claimant's impairment or combination of impairments meets or equals a listed impairment.  20 C.F.R. 416.920(a)(4)(iii); *accord Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If a claimant has an impairment that meets or equals a listed impairment, disability is presumed and benefits are awarded.  20 C.F.R. § 416.920(d).

The mere diagnosis of a listed condition does not establish that a claimant "meets" a listed impairment.  *See* 20 C.F.R. § 416.925(d); *Young v. Sullivan*, 911 F.2d 180, 183–84 (9th Cir. 1990).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see also* 20 C.F.R. § 416.925(d).  Where an ALJ determines at Step Three that a claimant's impairment does not meet a listing, the ALJ must provide adequate support for that decision.  *Lewis*, 236 F.3d at 514.  An ALJ satisfies this requirement by adequately discussing the evidence supporting the Step Three determination anywhere in the decision.  *See Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013).

    b.    Listing 1.04(A)

Listing 1.04 requires a finding of disability for a claimant who: (1) has a disorder of the spine, such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture," (2) which results in "compromise of a nerve root . . . or the spinal cord," and (3) is accompanied by the additional requirements set forth under subsections 1.04(A), 1.04(B), or 1.04(C).  20 C.F.R. 404, subpt. P, app. 1, § 1.04.

///

Subsection 1.04(A), the subsection at issue here, requires:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id.* § 1.04(A).

Thus, where, as here, the claimant has been diagnosed as suffering from a specified spinal disorder impairments, one of which involves the lower back, the following criteria must be satisfied in order to meet Listing 1.04(A): (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by (4) sensory or reflex loss; and (5) a positive straight-leg raising test in both the (a) sitting and (b) supine position. Furthermore, because Listing 1.04(A) does not specify a shorter durational period, the claimant must establish that the impairment meeting the Listing has lasted or can be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 416.925(c)(4) ("For some listings, we state a specific period of time for which your impairment(s) will meet the listing. For all others, the evidence must show that your impairment(s) has lasted or can be expected to last for a continuous period of at least 12 months.").

### 2.   Discussion

At Step Two, the ALJ found Plaintiff to have severe impairments of degenerative disc disease of the lumbar spine and degenerative disc disease of the cervical spine, *inter alia*. (AR 17.) At Step Three, the ALJ found these severe impairments did not meet or medically equal the severity of Listing 1.04. (AR 19.) As explanation, the ALJ stated only that:

the claimant's medically determinable impairments, alone or in combination, do not meet or medically equal any listing in Appendix 1, Subpart P, Regulations No. 4, including Listings 1.02 and 1.04. No physician has opined

that the claimant's condition meets or equals any listing, and the state agency program physicians opined that it does not.

(*Id.*)

Where an ALJ determines at Step Three that a claimant's impairment does not meet a listing, the ALJ must provide adequate support for that decision. *Lewis*, 236 F.3d at 514. Because the ALJ did not discuss in any detail why Plaintiff's degenerative disc disease of the lumbar and cervical spines did not meet listing 1.04(A) at Step Three, the ALJ erred unless he adequately discussed the evidence supporting his decision elsewhere in the hearing decision. *See Kennedy*, 738 F.3d at 1178; *see also Jennifer B. v. Berryhill*, NO. 3:18-cv-05046 JRC, 2018 WL 6178220, at *2 (W.D. Wash.  Nov. 27, 2018) ("Even if an ALJ makes a boilerplate finding that an impairment does not meet a listing, [the] [c]ourt will not reverse where the ALJ made sufficiently detailed findings in other portions of [the] decision.").

      a.   <u>Cervical Spine</u>

Following his Step Three determination, the ALJ proceeded to Step Four where he discussed some of the medical evidence relating to Plaintiff's cervical spine in greater detail:

> The record establishes osteaoarthritis [sic] of the cervical spine.  MRI scan of the cervical spine in July 2016 showed mild disc space narrowing at C5-6 with minimal disc protrusion; there was no significant canal or neural foraminal stenosis.  MRI scan of the cervical spine in May 2017 showed moderate degenerative changes at C5-6 with a 2mm osteophyte complex.  X-ray studies of the cervical spine in March 2017 and May 2017 were normal other than mild cervical spondylosis.  Examinations of the cervical spine have been generally normal other than mild pain with range of motion, except as indicated by Dr. Steiner in March 2017 with limited range of motion in all directions due to pain, tenderness in the paraspinal muscles, and paraspinal muscle spasm.  However, by June 2017, Dr. Steiner noted tenderness but no muscle spasm and limited flexion and extension due to pain; this was the same in August 2017 and in September 2017.  EMG/NCV testing in October 2017 showed no cervical radiculopathy or severe abnormalities.  QME Jean-Jacques Abit[b]ol, M.D., in his reports dated July 26, 2017, August 30, 2017, November 8, 2017, and February 15, 2018, found some restricted range of

motion of the cervical spine in all planes but no neurological deficits in the upper extremities. She underwent cervical spine surgery (cervical decompression and fusion at C5-6[]) by Dr. Abit[b]ol on February 6, 2018. Progress notes by Drs. Abit[b]ol and Steiner show mostly negative clinical signs after the surgery other than myofascial trigger points.

(AR 21 (citations omitted).)  The ALJ later stated:

In sum, the above residual capacity assessment is supported by consideration of the claimant's severe cervical spine impairment as supported by imaging studies showing degenerative changes without nerve root impingement and mostly normal examinations other than reduced range of motion of the cervical spine due to pain that improved with cervical spine surgery in February 2018.

(AR 22.)

The hearing decision does not make clear whether the ALJ considered this evidence in reaching his Step Three determination, but the Court nevertheless reviews this portion of the decision insofar as it may lend support to that determination.  The Court finds that the ALJ's discussion of the evidence relating to Plaintiff's cervical spine, although reasonably detailed for purposes of the RFC, contains few references to medical evidence regarding Listing 1.04(A) criteria and no specific conclusions about whether Plaintiff met each criterion.  The ALJ cites to some evidence supporting a finding that Plaintiff satisfied at least some of the Listing 1.04(A) criteria, e.g., evidence of a limited or restricted range of motion.  Notably, however, the ALJ did state that imaging of Plaintiff's cervical spine "show[ed] degenerative changes without nerve root impingement."  As stated, the first criterion under Listing 1.04(A) is whether the medical evidence established nerve root compression characterized by neuro-anatomic distribution of pain.  20 C.F.R. 404, subpt. P, app. 1, § 1.04(A).  However, in stating that Plaintiff's imaging studies showed

///
///
///
///

"degenerative changes without nerve root impingement," the ALJ did not include a citation to support this finding.[13]

Plaintiff argues that two medical records establish nerve root compression in her cervical spine. (ECF No. 10 at 20.) Plaintiff first points to an MRI from May 18, 2017, that revealed "mild narrowing of the central canal and moderate narrowing of the left neural foramen with deflection of the exiting left C6 nerve." (AR 479.) Plaintiff then points to Dr. Steiner's August 22, 2017 assessment of "cervical nerve root impingement," which Dr. Steiner seems to have based on the May 18, 2017 MRI. (AR 609.) The Court cannot reconcile the ALJ's unsupported statement that Plaintiff's imaging studies showed no nerve root compression with the medical records to which Plaintiff cites.[14]

However, the medical records also show that Plaintiff underwent cervical spine surgery—anterior cervical decompression and fusion ("ACDF") C5-6 surgery—on February 6, 2018, less than 12 months after her MRI showed nerve root compression on May 18, 2017. (AR 1015.) On July 26, 2017, her surgeon Dr. Jean-Jacque Abitbol reviewed an MRI of her cervical spine and found that it showed "moderate degenerative disc disease of C5-C6 with moderate narrowing of the left neural foramen with deflection of the left C6 nerve." (AR 701.) On November 8, 2017, Dr. Abitbol again noted that "MRI of the cervical spine reveals moderate stenosis at C5-C6" and recommended ACDF surgery to Plaintiff. (AR 711.) Dr. Abitbol performed the ACDF surgery on February 6, 2018.

---

[13] The Court notes that "[s]tanding alone, a boilerplate statement that the record does not contain evidence of a compromised nerve root or spinal cord is insufficient for [a] [c]ourt to meaningfully review the ALJ's decision." *Jennifer B.*, 2018 WL 6178220, at *3. "In rendering a decision, an ALJ must provide the reasoning underlying [his] decision 'in a way that allows for meaningful review.'" *Id.* (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015)).

[14] The Court notes that a Consultation Note from Sharp Grossmont Hospital on July 9, 2016, found that an MRI of Plaintiff's cervical spine "did not demonstrate any significant canal or neural foraminal stenosis, and there "was no evidence of cord compression or cord edema." (AR 291.)

(AR 1015.)  Dr. Abitbol's operative report confirmed a diagnosis of "cervical stenosis C5-6 with left upper extremity radiculopathy" and reported that during surgery "bilateral foraminotomies" were performed and "decompression was thus completed."  (*Id.*)  Dr. Abitbol's February 15, 2018 progress report provides that Plaintiff reported that "radicular symptoms in the bilateral upper extremities have resided."  (AR 1031.)

Plaintiff argues that post-surgery, she "continued to be symptomatic" in that her physical therapist reported that Plaintiff "exhibited reduced bilateral upper extremity strength and limited cervical range of motion."  (ECF No. 10 at 11 (citing AR 1036).)  Plaintiff further provides that multiple post-surgery physical exams "showed limited cervical and lumbar range of motion, a kyphotic spine, and limited abduction of her bilateral upper extremities."  (*Id.* at 12 (citing AR 1045–46, 1167, 1259).)  Plaintiff, however, does not cite to, nor does the Court find in the record, any post-operative evidence showing that there was (a) nerve root compression in her cervical spine that was (b) characterized by neuro-anatomic distribution of pain after her ACDF surgery.  *See, e.g.*, *Stoutmeyer v. Saul*, No.: 4:18-cv-00532-REB, 2020 WL 1239663, at *6 (D. Idaho Mar. 13, 2020) ("Petitioner has not shown that his degenerative disc disease included nerve root compression under Listing 1.04A for the requisite 12-month period.  Notwithstanding other evidence of spinal problems, the absence of clinical evidence of nerve root compression after the surgery intended to alleviate that condition meant inescapably, that he did not meet the Listing requirements.").  To the contrary, Dr. Abitbol's operative report states that decompression was completed during surgery, and in a follow-up appointment, Plaintiff reported to Dr. Abitbol that her radicular symptoms had resided.  (AR 1015, 1031.)

Defendant suggests that Plaintiff has not met her burden to show that she met all the criteria for Listing 1.04(A) as to her degenerative disc disease of her cervical spine for the required 12-month period.  (*See* ECF No. 12-1 at 17 ("Because the definition of disability is that the disability last for at least 12 months, it is not enough that the claimant meets the listing at one point in time, but does not meet it the next month.").)  In reply, Plaintiff contends that although "it appears" the Commissioner argues that she "does not meet the

listing because she did not meet it for at least 12 months," the Commissioner's argument is a post-hoc rationalization, as the ALJ "did not argue this in his decision." (ECF No. 14-1 at 8.)

Because Plaintiff's ACDF surgery was less than 12 months after the May 18, 2017 MRI first diagnosing nerve root compression in her cervical spine, the Court finds that—despite any error by the ALJ in assessing whether Plaintiff met Listing 1.04(A)—Plaintiff has not met her burden to show that she met all the criteria for Listing 1.04(A) as to her degenerative disc disease of the cervical spine for the required 12-month period. Plaintiff's argument that the Court cannot rely on this basis for affirming the ALJ's decision because it is a post-hoc rationalization is without merit, for she bears the burden of proving disability based on the Listing 1.04(A), which includes showing that she "fulfill[ed] all of the Listing's requirements for at least twelve months." *Kellenbach v. Berryhill*, 766 F. App'x 518, 520 (9th Cir. 2019); *see also Abelardo H. v. Saul*, No.: 3:19-cv-00230-JM (RNB), 2019 WL 5894666, at *4 (S.D. Cal. Nov. 12, 2019) ("[S]ince Listing 1.04(A) does not specify a shorter durational period, the claimant must establish that the impairment meeting the Listing has lasted or can be expected to last for a continuous period of at least 12 months." (citing 20 C.F.R. § 416.925(c)(4)), *adopted by* 2020 WL 1429845 (S.D. Cal. Mar. 24, 2020); *Kellenbach v. Berryhill*, NO. C17-5127-MAT, 2017 WL 3454573, at *3 (W.D. Wash. Aug. 11, 2017) ("Plaintiff has not shown that he does meet Listing 1.04(a) for the requisite 12 months, which is fatal to his claim of harmful step-three error."), *aff'd*, 766 F. App'x 518 (9th Cir. 2019); *Felton v. Colvin*, No. 2:15-cv-2315-CKD, 2016 WL 6803680, at *3 (C.D. Cal. Nov. 17, 2016) (rejecting the plaintiff's argument that "she was only required to prove that the impairment itself, a spinal disorder resulting in compromise of the nerve root, was present for more than 12 months and that the other criteria were met at any point in time during the relevant period"); *Riggs v. Astrue*, No. CV–08–0187–CI, 2009 WL 854527, at *6 (E.D. Wash. Mar. 30, 2009) ("Plaintiff points to no medical evidence that establishes nerve root compression (an essential criterion in Listing 1.04A) that lasted or was expected to last 12 months."). Further, even though the ALJ in this case

did not specifically find that Plaintiff did not meet Listing 1.04(A) for 12 months with respect to her cervical spine, the Commissioner's brief argument and this Court's finding that Plaintiff has not presented evidence of meeting all of Listing 1.04(A)'s requirements for at least 12 months is not post hoc rationalization.  *See Kellenbach*, 2017 WL 3454573, at *3 (rejecting the plaintiff's argument that the Commissioner engaged in post hoc rationalization by arguing that the plaintiff did not meet Listing 1.04(A) for 12 months because "to show a harmful step-three error, [the] [p]laintiff must show that he indeed satisfies Listing 1.04(a)").

Accordingly, the Court finds that any error made by the ALJ in not explaining how his findings comported or failed to comport with Listing 1.04(A) in a way that allowed for meaningful review was harmless, as Plaintiff has not met her burden to show that she met all criteria in Listing 1.04(A) for the requisite 12-month period.[15]  *See Abelardo H.*, 2019 WL 5894666, at *4 ("The lack of medical evidence establishing nerve root compression in itself is dispositive of plaintiff's claim that the ALJ erred by failing to find that plaintiff met or equaled Listing 1.04(A).").

### b.  Lumbar Spine

Plaintiff also argues that the ALJ erred by failing to find that her severe impairment of degenerative disc disease of the lumbar spine did not meet or equal Listing 1.04(A). (ECF No. 10 at 19–22.)  Plaintiff asserts that "to the extent [she] has had any improvement in her cervical impairment post-surgery[,] her lumbar impairment meets Listing 1.04(A) on its own."  (*Id.* at 22.)

///

---

[15]   The Court also notes that although Plaintiff argues that all criteria for Listing 1.04(A) were present at *some time*, she does not argue that that each criterion was simultaneously present for at least 12 months.  *See Doran v. Colvin*, No. CV-16-00334-PHX-JAT, 2016 WL 6647665, at *5 (D. Ariz. Nov. 8, 2016) ("Plaintiff also failed to meet his burden of proving evidence indicating he met all of the Listing 1.04(A) criteria, including the durational and simultaneity requirements.").

As stated above, the ALJ made a cursory finding at Step Three that Plaintiff did not meet Listing 1.04. (AR 19.) Following his Step Three determination, the ALJ proceeded to Step Four, wherein he summarized some of the medical evidence relating to Plaintiff's lumbar spine impairment:

> The claimant has complained of back pain that radiates into the bilateral lower extremities. MRI scan of the lumbar spine in July 2016 showed L2-3 disk protrusion causing impingement along the LS-Sl, stable grade I spondylolisthesis and bilateral spondylosis. X-ray of the lumbar spine in October 2016 showed mild degenerative changes. MRI scan of the lumbar spine in January 2017 showed a 4mm left disc bulge; mild degenerative changes. X-ray of the thoracic spine in March 2017 showed minimal degenerative changes. She has had multiple physical therapy sessions without reported improvement. Examinations of the lumbar spine since the alleged onset date have been mostly normal with negative straight leg raise test bilaterally; normal strength in the bilateral lower extremities; full range of motion of the lumbar spine, except for examinations by Dr. Steiner in March 2017 that document limited range of motion of the lumbar spine, tender points, limited range of motion of the thoracic spine, diminished strength in the lower extremities (4/5). However, by April 2017, Dr. Steiner noted full range of motion of the lumbar spine with no muscle spasm. She reported that she was seen by a spinal surgeon who told her that she was not a candidate for surgery. In June 2017, Dr. Steiner found no paraspinal tenderness, no muscle spasm, and limited flexion and extension due to pain; and normal motor strength in the lower extremities; this was the same in August 2017. QME Jean-Jacques Abit[b]ol, M.D., in his reports dated July 26, 2017, August 30, 2017, and November 8, 2017, and found some restricted range of motion of the lumbar spine in all planes, tenderness in the lumbar spine, diffusely weak in the bilateral lower extremities. Examinations by Dr. Steiner in 2018 have been mostly normal; except in February 2018 when she had limited range of motion due to pain. She has been treated with pain medications including Norco, Baclofen, Gabapentin, Ibuprofen; and trigger point injections.

(AR 20–21.) The ALJ later added that the RFC "accounted for back pain with imaging studies showing degenerative changes without significant stenosis or other abnormalities, mostly normal clinical findings, and very conservative treatment." (AR 22–23.)

As with the ALJ's summary of the medical records pertaining to Plaintiff's cervical spine, the hearing decision does not make clear whether the ALJ considered this evidence

in reaching his Step Three determination.  Nevertheless, the Court reviews this portion of the decision insofar as it may lend support to that determination.  The Court again finds that, although this summary of the evidence relating to Plaintiff's lumbar spine impairment is detailed and evidences that the ALJ thoroughly reviewed the record, the ALJ did not make any specific conclusions about whether Plaintiff's lumbar impairment met any of the Listing 1.04(A) criteria.  As to the first criterion (nerve root compression characterized by neuro-anatomic distribution of pain), the ALJ noted that an MRI from 2016 "showed L2-3 dis[c] protrusion causing impingement," but did not comment on whether the impingement was characterized by neuro-anatomic distribution of pain.  As to the second criterion (limitation of motion of spine), the ALJ pointed to findings in the record of both a limited or restricted range of motion of the lumbar spine and full range of motion of the lumbar spine.  As to the third and fourth criteria (motor loss [muscle weakness] accompanied by sensory or reflex loss) criteria, the ALJ pointed to findings in the record of "diminished strength in the lower extremities," "normal motor strength in the lower extremities" and "diffusely weak in the bilateral lower extremities."   When the ALJ did note instances of motor loss, he did not note whether it was accompanied by sensory or reflex loss.  The Court cannot discern what conclusions the ALJ drew from the summary he provided as to whether Plaintiff met or did not meet the first four Listing 1.04(A) criteria.  *See Coelho v. Colvin*, No. 3:13-CV-04060-JSC, 2014 WL 5107058, at *13 (N.D. Cal. Oct. 10, 2014) ("When the 'Court simply cannot determine from the ALJ's opinion how [s]he came to the conclusion that [Plaintiff's] "severe" impairments did not equal' the listing, the 'ALJ's recitation of the evidence does not provide an adequate foundation for [her]' finding that the listing was not met." (alterations in original) (quoting *Santiago v. Barnhart*, 278 F. Supp. 2d 1049, 1058 (N.D. Cal. Oct. 10, 2014))); *Cuevas v. Colvin*, No. ED CV 12–1004–E, 2013 WL 1120088, at *5 (C.D. Cal. Mar. 18, 2013) ("The ALJ did discuss the medical evidence and did reference the various findings concerning nerve root compression, radiculopathy, [and] straight leg raising tests . . . .  However, the ALJ did not explain how these findings comport or fail to comport with Listing 1.04(A).)

As to the fifth criterion (positive straight-leg test [sitting and supine]), the ALJ stated that that "[e]xaminations of the lumbar spine since the alleged onset date have been mostly normal with negative straight leg test bilaterally," seemingly finding that Plaintiff did not meet the last criterion. (AR 20.) A finding by the ALJ that the medical records did not establish a positive straight leg test—even if he did not make any specific finding as to the other criteria in Listing 1.04(A)—would satisfy the ALJ's duty. However, the ALJ failed to address that Plaintiff's medical records also contain positive straight leg tests, and he did not reconcile this with his finding that the record contained negative straight leg tests. Plaintiff points to three instances in the record where a positive straight-leg test was reported. (ECF No. 10 at 21.) On November 12, 2016, Plaintiff visited the emergency room at Sharp Grossmont Hospital "complaining of bilateral leg pain." (AR 282.) The nurse or physician who completed Plaintiff's physical examination noted that "[s]traight leg raise is positive." (AR 284.) On July 24, 2017, Plaintiff visited the La Maestra Community Health Centers Clinic ("La Maestra"), and the physician's assistant who completed her physical examination noted a "positive straight leg test." (AR 659.) On October 17, 2017, Plaintiff again visited La Maestra, and the physician who complete her physical exam noted a "left leg straight test positive." (AR 1215.)

Although the record indeed shows positive straight-leg tests that the ALJ failed to mention, the record is silent as to whether any of these positive straight-leg tests were completed in the sitting position, the supine position, or both. Listing 1.04(A) makes clear that a claimant must show a positive straight-leg raising test in *both* the sitting and supine positions. *See* 20 C.F.R. 404, subpt. P, app. 1, § 1.04(A). Moreover, the Ninth Circuit has held that a plaintiff does not meet his or her burden to show that an impairment meets Listing 1.04(A) if the record "does not specify if the testing conducted included sitting, supine, or both types of straight-leg testing." *Kellenbach*, 766 F. App'x at 520; *accord Yanchar v. Berryhill*, 720 F. App'x 367, 370 (9th Cir. 2017) ("[T]he positive straight-leg raising tests in the record do not specify whether [plaintiff] tested positive in both sitting and supine, as required to qualify under Paragraph A of the listing . . . . Because [plaintiff]

has not established that she fulfills all the specified medical criteria, the ALJ did not err in finding she did not meet Listing 1.04."); *see also Abelardo H.*, 2019 WL 5894666, at *5 ("[W]hile plaintiff has cited evidence in the medical record of positive straight leg raising, that evidence does not reflect the performance of testing in both the seated and supine positions, as Listing 1.04(A) requires where, as here, the lower back is involved. For this reason as well, the Court rejects plaintiff's claim that the ALJ erred by failing to find that plaintiff met or equaled Listing 1.04(A)." (citations omitted)). Because the record here is ambiguous with respect to the nature of Plaintiff's positive straight-leg raising tests, Plaintiff has not met her burden to show that she meets Listing 1.04(A). Accordingly, the Court finds that any error made by the ALJ in not explaining how his findings comported or failed to comport with Listing 1.04(A) in a way that allowed for meaningful review was harmless.

## C.    Claim 4—The ALJ's Physical RFC Determination

Plaintiff last argues that the ALJ erred because substantial evidence does not support the ALJ's findings that she can reach, handle, and finger with her upper extremities and perform a light level of exertion. (ECF No. 10 at 24–26.) Plaintiff seems to argue that the medical records and her testimony at the hearing with respect to her severe impairments of moderate degenerative disease of the bilateral shoulders and degenerative disc disease of the cervical spine require an RFC with manipulative limitations. (*See id.* at 25.) Plaintiff further argues that the ALJ should have limited her to sedentary work. (*Id.* at 26.) Plaintiff contends that "the record contains enough doubt as to whether" she could perform light work, and therefore "the ALJ should have fulfilled his duty to develop the record and obtained a new physical RFC from a consultative examiner." (*Id.* at 27.) Plaintiff points out that "the [s]tate agency opinion the ALJ relied on was well before the balance of the records were included," "including her surgery records." (*Id.*; ECF No. 14-1 at 9.)

In response, the Commissioner only addresses Plaintiff's argument that the RFC should have included manipulative limitations. (ECF No. 12-1 at 20.) The Commissioner argues that the ALJ did not err by not including any manipulative limitations in the RFC

because "there are no physicians who opined that Plaintiff had any manipulative limitations." (*Id.*)  The Commissioner likewise points out that the state agency medical physicians' opinions were the only medical opinions concerning Plaintiff's functional capacity, and the opinions were in agreement that Plaintiff had no manipulative limitations. (*Id.*)

Here, the ALJ determined Plaintiff had an RFC to perform light work as defined in 20 C.F.R. § 416.967.  Specifically, the ALJ found that Plaintiff was able to:

> lift or carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours out of an 8-hour workday; stand or walk for 6 hours out an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl; avoid concentrated exposure to extreme cold or heat, vibrations, unprotected heights or dangerous machinery.

(AR 20.)  In making his RFC determination, the ALJ assigned great weight to the assessments of the state agency physicians, who opined that Plaintiff was limited to light work with the same limitations included by the ALJ.  (AR 22.)  The ALJ noted that there were "no conflicting opinions of record."  (*Id.*)

As pointed out by the Commissioner, the question here is whether the ALJ's RFC determination was supported by substantial evidence.  (*See* ECF No. 12-1.)  Both parties here highlight that the only medical opinions providing an assessment of Plaintiff's functional capacity with respect to her physical impairments were the opinions of the state agency physicians.  No treating physician ever opined that there were any functional limitations stemming from Plaintiff's physical impairments.  The question before the Court, then, is whether the state agency physicians' opinions could serve as substantial evidence in support of the ALJ's RFC determination that Plaintiff could perform light work without any manipulative limitations.

Opinions of a non-examining physician may serve as substantial evidence only when they are supported by other evidence in the record and are consistent with it.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may . . .

serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."). "[T]he fact that a non-examining state agency physician fails to review the entire record does not, by itself, mean that his or her opinion cannot serve as substantial evidence." *Maliha K. v. Saul*, No. 8:19-cv-00877-MAA, 2020 WL 2113671, at *6 (C.D. Cal. May 4, 2020); *see also Owen v. Saul*, 808 F. App'x 421, 423 (9th Cir. 2020) ("[T]here is always some time lapse between a consultant's report and the ALJ hearing and decision, and the Social Security regulations impose no limit on such a gap in time."); *Meadows v. Saul*, 807 F. App'x 643, 647 (9th Cir. 2020) ("[A]lthough the non[-]examining state agency physicians did not review any evidence beyond August 2014, the ALJ did not err in giving great weight to the physicians' opinions.")).  However, it is "erroneous for an ALJ to rely on a non[-]examining physician's opinion if the physician had no opportunity to review subsequent evidence that undermined that opinion." *Maliha K.*, 2020 WL 2113671, at *6 (citing *Hill v. Astrue*, 698 F.3d 1153, 1160–61 (9th Cir. 2012) (holding that a non-examining physician's opinion that failed to consider a more recent, severe panic attack that was inconsistent with the physician's opinion could not provide substantial evidence to support the ALJ's decision)).

Here, Plaintiff's claim for SSI was denied at the initial level on July 19, 2017, and upon reconsideration on December 21, 2017.  (AR 59, 70.)  Therefore, as Plaintiff points out, any medical records added to the administrative record after December 21, 2017 were not reviewed by the state agency physicians.  The Court recognizes that the non-treating state agency physicians' inopportunity to review the entire record that was before the ALJ does not necessarily mean that their opinions could not serve as substantial evidence for the ALJ's RFC determination.  Plaintiff does not point to any specific medical records created subsequent to the agency's decision on reconsideration that would undermine the opinions of the state agency physicians.  Plaintiff's argument mostly focuses on the fact that she continued to receive treatment for her physical impairments subsequent to the state agency physicians' opinions.  However, Plaintiff does bring to light the fact that Plaintiff's ///

ACDF surgery records were among the records not reviewed by the state agency physicians.  (*See* ECF No. 10 at 27.)

The Court finds significant the fact that the state agency physicians did not have the opportunity to review the medical record's surrounding Plaintiff's ACDF surgery, and specifically, her post-operative physical therapy records.  The state agency physician's findings on reconsideration showed only that he reviewed the May 18, 2017 MRI of Plaintiff's cervical spine, and in finding that a light RFC was appropriate, the agency physician noted that Plaintiff had "intact strength and sensation."  (AR 75.)

Plaintiff's underwent ACDF surgery in February 2018 after the decision on reconsideration was issued in December 2017.  Plaintiff's post-surgery physical therapy notes from Spine & Sport show that Plaintiff was working toward regaining strength in her upper extremities, specifically with the goal of being able to lift more than 10 pounds without restriction.  On March 18, 2018, Plaintiff's physical therapist noted that post-surgery, Plaintiff demonstrated "limitations in cervical range of motion and bilateral upper extremity strength" that "limit[ed] her ability to lift and to turn her head for ADLs."  (AR 1036.)  Plaintiff's bilateral upper extremity strength was recorded as "abnormal," and her primary functional limitation was noted as "difficulty with lifting" with the goal of being able to lift "[more than] 10 pounds without restriction" by May 28, 2018.  (AR 1036–37.)  On May 16, 2018, Plaintiff's physical therapist noted that Plaintiff had "completed 7/12 visits and report[ed] significant functional improvement with improved ability to lift and walking with decreased symptoms."  (AR 1046.)  Although Plaintiff was seeing positive results from the therapy sessions, her bilateral upper extremity strength was still recorded as "abnormal," and her primary functional limitation continued to be "difficulty with lifting" with the goal of being able to lift "[more than] 10 pounds without restriction" by May 28, 2018.  (AR 1046–47.)  On an undated patient questionnaire from Spine & Sport, Plaintiff wrote that she felt like she could not return to work at that time because she could not "lift."  (AR 1050.)  On another undated patient questionnaire, Plaintiff wrote that walking and lifting made her pain worse.  (AR 1051.)

Progress notes from Plaintiff's physical therapy sessions after May 16, 2018, if any, are not included in the record before the Court.[16]   As such, whether Plaintiff achieved her goal of lifting more than 10 pounds without restriction and whether plaintiff can now "lift or carry 20 pounds occasionally and 10 pounds frequently," as included in the RFC, is not apparent.   At the administrative hearing, the ALJ engaged in a short series of questions about how much weight Plaintiff could carry, but did not resolve whether Plaintiff ever reached her physical therapy goal of being able to lift more than 10 pounds without restriction.   When the ALJ asked Plaintiff how much weight she could lift or carry with her right hand, she responded that a gallon of milk was "heavy," but she could "do it."[17]   (AR 42.)

As defined by the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."   20 C.F.R. § 416.967(b).   Further, "to be considered capable of performing a full or wide range of light work," a claimant "must have the ability to do substantially all" of the activities involved in performing light work.   *Id.*   The Court finds that Plaintiff's post-surgery

---

[16]   The Court notes that the ALJ does not cite to Plaintiff's physical therapy records in the hearing decision.   With respect to Plaintiff's ACDF surgery, the ALJ stated only that "[p]rogress notes from Drs[.] Abit[b]ol and Steiner show[ed] mostly negative clinical signs after the surgery other than myofascial trigger points."   (AR 21.)   Dr. Steiner's progress notes from March 19 through July 16, 2018, do not address Plaintiff's ability to lift, noting only that "motor strength" in the bilateral upper extremities during this period was "5/5." (AR 1244, 1248, 1254, 1259, 1264.)   Similarly, Dr. Abitbol's progress reports from April 4 and May 10, 2018, noted "5/5" in "motor strength" in an "upper extremity neurological examination."   (AR 1039, 1042.)

[17]   In his second hypothetical to the VE, the ALJ did include lifting limitations of "seven pounds with the left non-dominant extremity" and "eight pounds with the right dominant extremity."   (AR 56–57.)   The VE testified that the ALJ's second hypothetical was "not consistent with competitive employment."   (AR 57.)   However, the hypothetical also included several other limitations that were more extreme than those included in the RFC, e.g., "sit for 10 minutes of a time" and "stand or walk for 10 minutes at a time" and "will need excess breaks."   (*Id.*)

physical therapy records, which showed that Plaintiff was not able to lift more than 10 pounds without restriction in May 2018, potentially undermined the opinion of the state agency physicians that Plaintiff could perform light work and that her strength was "intact." In other words, because the state agency physicians had no opportunity to assess Plaintiff's physical RFC after her ACDF surgery, their opinions could not serve as substantial evidence to support the ALJ's RFC determination that Plaintiff could engage in light work.

Further, there is no opinion evidence from any treating or examining physician regarding Plaintiff's post-surgery functional limitations, and the ALJ could not rely solely on his interpretation of the medical records in assessing Plaintiff's physical RFC. *See Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("[T]he ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician."); *e.g.*, *Molina v. Berryhill*, No. 2:17-cv-01991 CKD, 2018 WL 6421287, at *4 (E.D. Cal. Dec. 6, 2018) (holding that the ALJ's RFC determination was not supported by substantial evidence when the ALJ made her own evaluation of the functional limitations caused by the plaintiff's diagnosed impairments without further developing the record through a consultative examination); *Rivera v. Berryhill*, No. ED CV 16-791-SP, 2017 WL 5054656, at *4–5 (C.D. Cal. Oct. 31, 2017) (holding that the ALJ's RFC determination was not supported by substantial evidence where the treatment records did not provide sufficient indications of the plaintiff's functional limitations and no physician who had reviewed the medical records had provided an opinion regarding any functional limitations). In Social Security cases, the ALJ has a special, independent duty to develop the record fully and fairly and to assure that the claimant's interests are considered, and this special duty exists even when the claimant is represented by counsel. *See Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen*, 80 F.3d at 1288; *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). "The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)

(quoting *Mayes* 276 F.3d at 459–60).  "A specific finding of ambiguity or inadequacy of the record is not necessary to trigger this duty to inquire, where the record establishes ambiguity or inadequacy." *Id.*

The Court agrees with Plaintiff that the ALJ had a duty to develop the record and order a consultative examination in this case, for without one, his RFC determination that Plaintiff could perform light work was not based on substantial evidence.  *See Hayes v. Colvin*, No.: 3:16-cv-00140-JLS-MDD, 2016 WL 11281409, at *8 (S.D. Cal. Dec. 19, 2016) ("When the administrative record does not contain any opinion by a treating or examining physician regarding [the] plaintiff's RFC, the ALJ has a duty to obtain such an opinion." (internal citations omitted) (quoting *De Lopez v. Astrue*, 643 F. Supp. 2d 1178, 1183 (C.D. Cal. 2009))), *adopted by* 2017 WL 781580 (S.D. Cal. Mar. 1, 2017); *Mendenhall v. Astrue*, No. CV 10–586–TUC–HCE, 2012 WL 896251, at *12 (D. Ariz. Mar. 16, 2012) ("[T]he record is devoid of any assessment from a medical source of Plaintiff's physical [RFC] post-surgery.  The instant record does not contain adequate medical information from which the ALJ could possibly assess Plaintiff's post-surgical physical [RFC]."); *Sepulveda v. Astrue*, No. EDCV 09-2034 RNB, 2010 WL 2990111, at *1 (C.D. Cal. July 28, 2010) ("[I]n the Court's view, the ALJ erred by not ordering [the] plaintiff to undergo a consultative examination, when the post-hearing medical records did not include an assessment of plaintiff's post-surgery functional limitations . . . .  [T]he Court finds that the ALJ's failure to do so in this instance, where there was insufficient medical evidence in the record to determine plaintiff's post-surgery status, constituted a violation of the ALJ's special duty to fully and fairly develop the record and resulted in a decision that was based on pure conjecture.").

Thus, the ALJ erred.  Moreover, the Court is unable to find that the error was "inconsequential to the ultimate nondisability determination" and therefore harmless.  *Molina*, 674 F.3d at 1115.  As stated above, at Step Four, the ALJ determined that Plaintiff could perform past relevant work as a hand packer, which is classified as light work with ///

physical demands "in excess of those for Sedentary work."[18]  *Inspector and Hand Packer*, DOT 559.687-074, 1991 WL 683797 (Jan. 1, 2016).  Upon further examination, it may be that Plaintiff does not have a physical RFC to perform light work.[19]

**D.   <u>Remand is Appropriate</u>**

The law is well established that the decision whether to remand for further proceedings or simply to award benefits is within the discretion of the Court.  *See, e.g.*, *Salvador v. Sullivan*, 917 F.2d 13, 15 (9th Cir. 1990); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Remand for further proceedings is warranted where additional administrative proceedings could remedy defects in the decision.  *See, e.g.*, *Kail v. Heckler*, 722 F.2d 1496, 1497 (9th Cir. 1984); *Lewin*, 654 F.2d at 635.  Remand for the payment of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *Kornock v. Harris*, 648 F.2d 525, 527 (9th Cir. 1980), where the record has been fully developed, *Hoffman v. Heckler*, 785 F.2d 1423, 1425 (9th Cir. 1986), or where remand would unnecessarily delay the receipt of benefits to which the disabled plaintiff is entitled, *Bilby v. Schweike*r, 762 F.2d 716, 719 (9th Cir. 1985).

The Court has concluded that this is not an instance where no useful purpose would be served by further administrative proceedings.  The record here has not been fully developed with respect to Plaintiff's physical functional limitations after her ACDF surgery, and further administrative review could remedy the ALJ's errors in assessing Plaintiff's RFC.  Accordingly, remand is appropriate.

---

[18]   Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  20 C.F.R. § 416.967(a).

[19]   Because the Court finds that ALJ's physical RFC determination that Plaintiff could perform light work was not supported by substantial evidence, the Court declines to address Plaintiff's argument with respect to the ALJ's failure to include manipulative limitations in the RFC.  Moreover, Plaintiff makes no argument as to why the ALJ's failure to include manipulative limitations in the RFC resulted in harmful error.

# VI. <u>CONCLUSION</u>

For the foregoing reasons, the Court **RECOMMENDS** the following:

(1)    Plaintiff's Motion for Summary Judgment (ECF No. 10) be **GRANTED**;

(2)    The Commissioner's Cross-Motion for Summary Judgment (ECF No. 12) be **DENIED**; and

(3)    Judgment be entered reversing the decision of the Commissioner and remanding this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties no later than **<u>August 25, 2020</u>**.    The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **<u>September 1, 2020</u>**.    The parties are advised that a failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.    *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated:  August 10, 2020

Hon. Jill L. Burkhardt
United States Magistrate Judge

46

19-cv-00636-JM-JLB